UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                        :
RONALD GANTT,                                           :
                                                        :                09 Civ. 7310 (PAE)
                                        Plaintiff,      :
                        -v-                             :                OPINION & ORDER
                                                        :
MARTIN HORN et al.,                                     :
                                                        :
                                        Defendants.     :
                                                        :
------------------------------------------------------------------------X


PAUL A. ENGELMAYER, District Judge:

        Plaintiff Ronald Gantt, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983

claiming that defendants—corrections officers employed by the New York City Department of

Corrections ("DOC")—violated his Eighth Amendment rights during his incarceration.  He

claims the defendants (1) acted with deliberate indifference in depriving him of adequate medical

treatment, and (2) denied him outdoor recreation.[1]  Defendants now move for summary

judgment under Federal Rule of Civil Procedure 56.  For the reasons set forth, that motion is

granted.

---

[1] In his opposition to defendants' summary judgment motion, Gantt expressed the intention to abandon an additional claim, based on the confiscation of his footwear.  Pl. Br. 4.

I.      **Background and Procedural History**[2]

      **A.  Overview of Gantt's Incarceration During 2008 and 2009**

      Between September 17 and 25, 2008, Gantt was incarcerated by the DOC at the Anna M. Kross Center ("AMKC") on Riker's Island.   He was then released on bail.  Dantowitz Decl. ¶ 2. Between October 14, 2008, and May 6, 2009, Gantt was again incarcerated and housed at AMKC.  *Id.*  On May 6, 2009, Gantt was found to be in possession of narcotics and tobacco and was transferred to the Central Punitive Segregation Unit ("CPSU") of the Otis Bantum Correctional Center ("OBCC").  *See* Second Amended Complaint ("SAC") (Dkt. 24), at 4; Dantowitz Decl. ¶ 3.  On June 16, 2009, Gantt was transferred to a New York State correctional facility.  Dantowitz Decl. ¶ 3.  On June 26, 2009, Gantt was rearrested and returned to DOC, where he was housed at the Robert N. Davoren Center ("Davoren Center").  On June 28, 2009, Gantt was transferred from the Davoren Center back to the CPSU at OBCC, where he was housed until July 17, 2009.  *Id.*  Gantt was then again transferred to a New York State correctional facility.  *Id.*

---

[2]  Although Gantt submitted a short opposition to the motion for summary judgment (Dkt. 93), it is essentially devoid of factual assertions, and Gantt failed to file a responsive statement of undisputed facts, as required by Rule 56.1 of the District's Local Civil Rules.  Where a party fails to do so, a district court "may in its discretion opt to 'conduct an assiduous review of the record,'" to assure that the non-movant's rights are protected, and the Court does so here.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)).  The background facts set forth herein are derived from the materials cited in defendants' Local Civil Rule 56.1 Statement of Undisputed Facts, with all ambiguities drawn in favor of the plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  These materials include the Declaration of Jeffrey S. Dantowitz ("Dantowitz Decl.") (Dkt. 83) and attached exhibit; the Declaration of Dr. Ross MacDonald ("MacDonald Decl.") (Dkt. 84) and attached exhibits; and Defendants' Local Rule 56.1 Statement of Material Fact ("Def. 56.1") (Dkt. 82).  Citations to defendants' 56.1 statement incorporate by reference the documents contained therein.

Gantt's claims of Eighth Amendment violations arise from his detention at both at AMKC and OBCC.  He claims that the defendants failed to adequately treat his rheumatoid arthritis and glaucoma, and unjustifiably delayed treating those conditions.

### B.  Gantt's Medical Treatment

On September 17, 2008, when Gantt arrived at AMKC, AMKC medical staff performed an intake medical examination.  Def. 56.1 ¶ 24.  They asked Gantt about any health conditions and whether he was taking medication for ongoing illnesses.  *Id.*  DOC's records of Gantt's intake do not indicate that he disclosed either that he was suffering from rheumatoid arthritis or glaucoma, or that he reported taking any medication for these, or any other, conditions.  *Id.*; MacDonald Decl. Ex. A ("Sept. 17 Exam.").

On October 15, 2008, following his return to DOC custody, a new intake medical screening was performed.  MacDonald Decl. ¶ 24.  DOC's records of Gantt's intake reflect that Gantt told attending medical staff that he suffered from rheumatoid arthritis.  DOC's records do not, however, reflect that Gantt identified any medications he was currently taking, or that Gantt disclosed that he was suffering from glaucoma.  *Id.*; *id.* Ex. B ("Oct. 15 Exam.").  The attending medical staff developed a plan to treat the pain associated with Gantt's rheumatoid arthritis, which included his taking 500 milligrams of Naprosyn twice daily.  Oct. 15 Exam. at 4.  That plan was approved by a supervising physician.  *Id.*  The same day, a pharmacy order was issued authorizing the administration to Gantt of 500 milligrams of Naprosyn twice daily for four days.  MacDonald Decl. ¶¶ 25–26; *id.* Ex. C.[3]

---

[3] It is unclear whether Gantt received this Naprosyn as prescribed.  Gantt claims in his Second Amended Complaint that he did not receive it for two weeks and that, in response, he placed his name on a sick call list requesting medical attention.  SAC 3.  An inmate who makes such a request can request a visit to the AMKC clinic for evaluation Monday through Friday, MacDonald Decl. ¶ 6, and may also seek medical treatment by making an emergency sick call, at

On December 14, 2008, during an emergency sick call, Gantt reported to the attending physician that he had glaucoma and required medication.  MacDonald Decl. ¶ 27.  The physician referred Gantt to the optometry clinic and issued a consultation request that Gantt be evaluated by the appropriate specialist.  *Id.*; *id.* Ex. D ("Dec. 14 Consultation Request").  The same day, the site medical director approved that request; Gantt was given an appointment at the prison's optometry specialty clinic scheduled for December 19, 2008.  MacDonald Decl. ¶¶ 27–28.  According to the DOC's records of Gantt's medical history, Gantt refused this appointment.  *See* Dec. 14 Consultation Request.[4]

On January 26, 2009, during a sick call visit, an attending physician examined Gantt, who had complained of pain associated with rheumatoid arthritis.  MacDonald Decl. ¶ 29; SAC 3.  The attending physician prescribed 500 milligrams of Naprosyn twice a day for five days.  MacDonald Decl. ¶ 29; *id.* Ex. E.  That evening, Gantt received a four-day supply of Naprosyn.  MacDonald Decl. Ex. F; *id.* ¶ 30.

The attending physician also referred Gantt to a rheumatologist.  *Id.* ¶ 31; *id.* Ex. G.  On February 11, 2009, Gantt was examined by a rheumatology specialist at Bellevue Hospital.

---

any time.  *Id.*  Gantt's medical records, which include records of other sick-call consultations, do not reflect any sick-call requests or consultations before December 14, 2008.  *Id*. ¶ 27.  On the other hand, the medical records do not reflect the distribution of a four-day order of Naprosyn to Gantt in accordance with the October 15 pharmacy order.  MacDonald Decl. Ex. C.  Even assuming that Gantt did not receive the Naprosyn prescribed in October, however, for the reasons that follow, this lapse is insufficient to support a claim under the Eighth Amendment.

[4] In his Second Amended Complaint, Gantt alleges that he "never refused any medical direction."  SAC 3.  Under Correctional Health Service ("CHS") policy, an inmate who refuses an appointment with a specialist must complete a Refusal of Treatment form indicating that he has met with medical staff and understands the risks of refusing such treatment.  MacDonald Decl. ¶ 13.  Defendants have not produced such a form related to Gantt's optometry appointment.  Gantt's refusal is instead documented only in a handwritten notation on the Consultation Request.  *See* Dec. 14 Consultation Request.

MacDonald Decl. ¶ 31; SAC 4.  The specialist recommended that Gantt receive 500 milligrams of Naprosyn twice a day or 600 milligrams of Ibuprofen three times a day.  MacDonald Decl. ¶ 31.

On February 24, 2009, Gantt was seen for mental health care by an AMKC social worker, who referred Gantt to the medical clinic for an evaluation related to his arthritis and glaucoma. *Id.* ¶ 32.  Two days later, on February 26, 2009, attending medical staff prescribed Gantt 500 milligrams of Naprosyn twice a day for three days.  *Id.* ¶ 33.  That evening, Gantt received a three-day supply of Naproxen (another name for Naprosyn).  *Id.*; *id.* Ex. H.

On May 7, 2009, in response to complaints of wrist pain, Gantt was prescribed 500 milligrams of Naproxen twice a day for four days.  *Id.* ¶ 34.  The following evening, Gantt received a four-day supply of Naproxen.  *Id.* Ex. I.

On June 27, 2009, Gantt was prescribed 400 milligrams of Motrin three times a day for four days; the following evening he received the Motrin.  *Id.* ¶ 35; *id.* Ex. J.  During the June 27, 2009 evaluation, Gantt reported for the first time that he had not taken glaucoma medication during the preceding eight months.  *Id.* ¶ 36.  He told the attending medical staff that he had missed his December 2008 ophthalmology appointment and, for the first time, told medical staff that he had previously been prescribed Travatan and Timolol.  *See id.* Ex. K ("June 27 Consultation Request").  Gantt was referred to the optometry clinic for evaluation.  *Id.*  However, Gantt failed to appear for his July 6, 2009 appointment at that clinic.  *See id.* Ex. L ("Specialty Clinic Form") (indicating that Gantt was a "No show" and needed a new appointment).

On July 12, 2009, Gantt was prescribed 400 milligrams of Motrin to be taken once a day for five days, and received a seven-day supply of Motrin the following evening.  *Id.* Ex. M.  On July 14, 2009, Gantt was examined by an attending physician who again referred him to the

optometry specialty clinic for evaluation of his glaucoma. *Id.* Ex. N ("July 14 Consultation Request"). On July 17, 2009, however, before he could be seen by the optometry clinic, Gantt was discharged from DOC and transferred to a New York State correctional facility. *Id.* ¶ 39; Dantowitz Decl. ¶ 3.

Although Gantt alleges that his eyesight "will suffer in the long run because of the action of the defendants," he acknowledges that his eyesight is "not yet damaged." SAC 7. When deposed on April 13, 2012, Gantt attested that he is "in regular shape except for the pain in the neck [and] back area." Dantowitz Decl. Ex. A ("Gantt Dep.").

### C. Gantt's Administrative Grievances

DOC's grievance procedure, the Inmate Grievance Resolution Program (the "IGRP"), sets out the steps an inmate must follow to exhaust his or her administrative remedies. Dantowitz Decl. ¶ 4. It states that "[i]f the inmate has not received any response [within the five-day period for informal resolution of grievances], the inmate should go to the Grievance Office to sign Form #710R and indicate on that form that a hearing is requested." *Id.* ¶ 5 (citation omitted). The IGRP also specifies the process that inmates confined to their cells must use to make a hearing request. *Id.* It further provides that inmates must appeal adverse determinations of their grievances to the warden, then to the Central Office Review Committee, and finally to the Board of Correction. *Id.* ¶ 6. *See, e.g., Mamon v. N.Y.C. Dep't of Corr.*, No. 10 Civ. 8055 (NRB), 2012 WL 260287, at * 3 (S.D.N.Y. Jan. 27, 2012) (summarizing the IGRP).

Gantt alleges that, beginning in October 2008, he filed four formal grievances relating to his medical care while in prison. *See* SAC 3, 4, 6. In support of his allegations, Gantt attached three of these grievances filed in May 2009, two on May 26, 2009. SAC 12–19. These grievances allege, *inter alia*, (1) denial of medical services, (2) denial of recreation time, and (3)

deficient cleanliness of visitation areas.[5]  Gantt further alleges that his grievances went

unanswered by prison officials.  *Id.*  DOC records indicate that, although Gantt's grievances

were apparently not acted upon, Gantt neither requested a hearing in connection with any of his

formal grievances, nor filed an appeal with the warden of any DOC facility, the Central Office

Review Committee, or the Board of Correction.  Dantowitz Decl. ¶ 7.  Gantt acknowledges that

he did not request a hearing related to his grievances and that he did not file any appeal.  Pl. Br.

1–2.

### D.  Procedural History

On August 19, 2009, Gantt filed his original Complaint against the DOC and individual

corrections officers pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment

rights.  Dkt. 2.  On March 24, 2010, defendants filed their answer to Gantt's original Complaint.

Dkt. 13.  On September 23, 2010, Gantt filed his First Amended Complaint.  Dkt. 21.  On

January 24, 2011, with permission of the Court, Gantt filed his Second Amended Complaint.

Dkt. 24.  On May 3, 2011, defendants filed their answer to Gantt's Second Amended Complaint.

Dkt. 48.  On May 10, 2011, the Court set a discovery schedule.  Dkt. 52.  On August 21, 2012,

after several extensions of the discovery period and briefing schedule, defendants moved for

summary judgment.  Dkt. 81–85.  On December 28, 2012, Gantt submitted his opposition to the

motion for summary judgment.  Dkt. 93.  On January 10, 2013, defendants filed a reply.  Dkt. 94.

## II.  Applicable Legal Standard

Under Rule 56, to prevail on a motion for summary judgment, the movant must "show []

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the

---

[5] Gantt does not bring any claim here relating to the cleanliness of visitation areas.

absence of a question of material fact.  In determining whether this standard has been met, the Court must view all facts "in the light most favorable" to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

The Court is mindful that Gantt is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).  However, this forgiving standard "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).  Bald assertions by a *pro se* litigant, "'completely unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment.'"  *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 620 n.1 (S.D.N.Y. 2010) (quoting *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995)).

Under Local Civil Rule 56.1, which governs factual statements on motions for summary judgment, "[e]ach numbered paragraph in the statement of material facts . . . will be deemed to be admitted . . . unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civ. R. 56.1(c).  In addition, "[e]ach statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."  Local Civ. R. 56.1(d).  When moving for summary judgment against a *pro se* litigant, the movant must provide the *pro se* litigant with "the papers in support of the motion . . . [and the] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached."  Local Civ. R. 56.2.  *Pro se* litigants provided with notice are not excused from satisfying their obligations under Local Civil Rule 56.1.  *Allen v. City of N.Y.*, 480 F. Supp. 2d 689, 703 (S.D.N.Y. 2007) (citing *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

Here, Gantt received such notice:  Defendants furnished him with their papers, the required notice, and copies of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1.  *See* Dkt. 81.  Gantt, however, failed to submit a responsive statement of material facts.  Although defendants argue that Gantt's failure necessitates admission of all factual statements provided in defendants' 56.1 Statement, *see* Def. Reply. Br. 2–4, that is not so:  The Court may not rely solely on the statement of undisputed facts contained in the movant's Local Rule 56.1 statement.  Rather, the Court "must be satisfied that the citation to evidence in the record supports the [movant's] assertion," *i.e.*, that the materials underlying defendant's 56.1

statement themselves establish these facts.  *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

### III.   Discussion

Defendants argue that: (1) Gantt failed to exhaust his administrative remedies, which, under 42 U.S.C. § 1997e(a), bars his claims here; (2) the facts do not permit the inference that the defendants acted with deliberate indifference to his medical needs; (3) DOC is not a suable entity and there is no basis for finding municipal liability; and (4) Gantt failed to serve certain named defendants, thus depriving this Court of jurisdiction over those individuals.

Defendants are correct that DOC is not a suable entity.  *See, e.g.*, N.Y.C. Charter Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."); *Jenkins v. N.Y.C. Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 510 (S.D.N.Y. 2009) ("The Defendant is 'clearly correct' and 'the overwhelming body of authority holds that [a city agency] is not a suable entity.'" (quoting *Renelique v. Doe*, No. 99 Civ. 10425 (LTS)(HBP), 2003 WL 23023771, at *6 (S.D.N.Y. Dec. 29, 2003))).  Accordingly, for the purposes of resolving this motion, the Court will substitute the City of New York for DOC.  *See, e.g.*, *Renelique*, 2003 WL 23023771, at * 7 (treating City, not agency, as defendant for purposes of resolving summary judgment motion).

For the reasons that follow, the Court holds that Gantt has failed (1) to exhaust his administrative remedies, and (2) to establish that defendants acted with deliberate indifference to serious medical needs.  The Court accordingly grants summary judgment to defendants, and has no need to reach defendants' arguments as to defective service or municipal liability.

A.  **Exhaustion**

The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before bringing a federal civil rights action.  42 U.S.C. § 1997e(a). Under the PLRA, "'[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'"  *Dennis v. Westchester Cnty. Jail Corr. Dep't*, 485 F. App'x 478, 480 (2d Cir. 2012) (summary order) (quoting 42 U.S.C. § 1997e(a)). "This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim." *Simmons v. Bezio*, No. 9:11-CV-753 (DNH/ATB), 2012 WL 3054127, at *2 (N.D.N.Y. June 21, 2012) (citing *Giano v. Goord*, 380 F.3d 670, 675–676 (2d Cir. 2004)) (additional citations omitted).  Inmates must exhaust their administrative remedies even if they are seeking only money damages otherwise unavailable in prison administrative proceedings.  *Giano*, 380 F.3d at 675.

Failure to exhaust all available administrative remedies is an affirmative defense.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds by Woodford v. Ngo*, 548 U.S. 81 (2006).  It must be raised by a defendant, and it is the defendant's burden to prove that the plaintiff failed to meet the exhaustion requirements.  *See Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009).  The prison's requirements, and not the PLRA, "define the boundaries of proper exhaustion."  *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (quoting *Jones*, 549 U.S. at 218).

"Courts must construe the exhaustion requirement strictly because '[a] prisoner who does not want to participate in the prison grievance system will have little incentive to comply with

the system's procedural rules unless noncompliance carries a sanction' and '[t]he benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.'"  *Petrucelli v. Hasty*, 605 F. Supp. 2d 410, 419 (E.D.N.Y. 2009) (quoting *Woodford*, 548 U.S. at 95).  Thus, partial exhaustion of administrative remedies is not sufficient, even if prison officials have actual notice of a claim.  *See Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

The Second Circuit has identified limited circumstances under which administrative exhaustion is not mandatory.  Exhaustion is not mandatory when:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion remedy.

*Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006).  Here, Gantt does not deny knowledge of the appeals procedure.  Rather, he claims, in his opposition to summary judgment, that he did not follow the grievance appeals process because "his efforts were thwarted by defendant Geurrant."  Pl. Br. 1.   In his Second Amended Complaint, Gantt does not make such a claim.  It does allege that he filed at least 15 grievances against medical staff and corrections officials, but that at least 11 were confiscated and he was able to produce only three.  SAC 6.  As to the response to those grievances, Gantt's Second Amended Complaint alleges only that Guerrant did not respond to his grievances, *id.*, not that he took affirmative steps to block Gantt from appealing.

Under the IGRP, Gantt was required to file an appeal if he did not receive a response to his grievance after five days—that is, "[t]he IGRP places the burden on the prisoner to request a formal hearing when there is no timely response to a grievance."  *Malik v. City of N.Y.*, No. 11

Civ. 6062 (PAC)(FM), 2012 WL 3345317, at * 7 (S.D.N.Y. Aug. 15, 2012), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sep. 28, 2012).  Gantt does not allege that he was misinformed or denied information about these procedures.  Thus, his failure to exhaust cannot be excused unless he can allege facts sufficient to demonstrate an "affirmative act by prison officials that would have prevented him from pursuing administrative remedies." *Ruggiero*, 467 F.3d at 178.

Here, Gantt—including in the opposition to summary judgment, in which he stated generally that his efforts to appeal had been thwarted—has failed to allege any "affirmative act" by prison officials that prevented him from either requesting a hearing or filing an appeal in accordance with the IGRP.  Gantt offers only the conclusory statement that he was "thwarted" from doing so.  This case is thus a far cry from those that have found prison official defendants estopped from raising non-exhaustion as an affirmative defense.  In each, the prisoner alleged concrete affirmative steps that officials had taken to prevent him from availing himself of administrative remedies.  *See, e.g.*, *Ziemba v. Wezner*, 366 F.3d 161, 162–63 (2d Cir. 2004) (recognizing estoppel as defense to PLRA exhaustion requirement where plaintiff alleged that he was beaten and threatened by prison officials and denied food and medical care in retaliation for his grievances); *Hemphill v. New York*, 380 F.3d 680, 687 (2d Cir. 2004) (plaintiff threatened with retaliation for pursuing administrative remedies).  Gantt alleges no such thing.  The most that his Second Amended Complaint can be said to allege by way of retaliation is that defendants told him that he would not get recreation.  SAC 7.  However, as Gantt acknowledges, even that statement was not in response to his grievances, but in response to his "yelling out of [his] cell." *Id.*  And even if such a threat could be found and, contrary to Gantt's allegations, even if it had

been made in response to his grievances, a threat to deny recreation would not suffice to prevent

Gantt from pursuing administrative remedies.[6]

 Therefore, defendants are not estopped from raising this defense, and Gantt's failure to

exhaust his administrative remedies is not excused. *See Ruggiero*, 467 F.3d at 178. Because

Gantt failed to exhaust his administrative remedies or to supply an excuse for his failure to do so,

defendants' motion for summary judgment must be granted as to all his claims.

### B.  Medical Care Claims

 An independent basis for granting summary judgment is that Gantt has failed to adduce

evidence sufficient to support an Eighth Amendment claim based on the medical care during his

incarceration.  To state a claim under § 1983, Gantt must show that "(1) the challenged conduct

was attributable at least in part to a person who was acting under color of state law and (2) the

---

[6] For this and other reasons, summary judgment is merited for the defense on the merits of
Gantt's claim based on an alleged denial of recreation. Although Gantt's Second Amended
Complaint and grievances allege generally that he was denied recreation, he has not mustered
any factual support for this claim.  Nor has he clearly alleged, let alone supported, specifically
what recreation was denied to him.  Gantt's allegations leave unclear whether Gantt alleges he
was denied all recreation during his incarceration; Gantt states only that "[e]ach morning, for the
duration of [his] stay at OBCC, [he] was never given recreation."  SAC 5.  In any event, even
assuming that Gantt was denied not just morning recreation but recreation at all hours during his
incarceration at OBCC, that denial would not give rise to an Eighth Amendment claim.  "Denial
of a prisoner's recreation privileges for an extended period of time violates the Eighth
Amendment if the denial results in a deprivation 'of the minimal civilized measure of life's
necessities' and the defendants act with a sufficiently culpable state of mind amounting to
deliberate indifference to a serious need."  *Beckford v. Portundo*, 151 F. Supp. 2d 204, 213
(N.D.N.Y 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)); *see also Anderson v.
Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985).  Gantt does not allege that he was denied all
opportunity to exercise, but only that he was denied outdoor recreation.  *See Anderson*, 757 F.2d
at 36 (noting "[c]ourts have recognized that some opportunity for exercise must be afforded to
prisoners," but the Constitution does not mandate it take a particular form).  The Court further
notes that Gantt was incarcerated at OBCC for a total of 64 non-consecutive days in 2009.  That
period is shorter than those in which a wholesale denial of recreation has been held to rise to the
level of an Eighth Amendment violation.  *See, e.g.*, *Jolly v. Coughlin*, 76 F.3d 468, 480–81 (2d
Cir. 1996) (three-and-a-half year denial of recreation held to violate the Eighth Amendment).

conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States."
*Sinder v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999).

Here, Gantt claims that, during his incarceration, the defendants, by acting with deliberate
indifference to his medical needs, violated his Eighth Amendment rights.  The Eighth
Amendment protects prisoners from "cruel and unusual punishment" caused by prison officials.
U.S. Const. amend. VIII.  "To determine whether a punishment is cruel and unusual, courts must
look beyond historical conceptions to 'the evolving standards of decency that mark the progress
of a maturing society.'"  *Graham v. Florida*, 130 S. Ct. 2011, 2021 (2010) (quoting *Estelle v.
Gamble*, 429 U.S. 97, 102, (1976)).

Where an Eighth Amendment claim involves alleged denials of medical care, "a prisoner
must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143
F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104) (alteration in original).  This
standard incorporates both objective and subjective elements:  "The objective 'medical need'
element measures the severity of the alleged deprivation, while the subjective 'deliberate
indifference' element ensures that the defendant prison official acted with a sufficiently culpable
state of mind."  *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2002); *see also Hathaway v.
Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

With respect to the objective element, there is no "static test" to determine whether a
deprivation is sufficiently serious.  *Jabbar*, 683 F.3d at 57.  A serious medical need is generally
characterized by "a condition of urgency, one that may produce death, degeneration, or extreme
pain."  *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (citation omitted).  The Second
Circuit has endorsed considering various factors in determining the existence of a serious
medical condition, including: (1) the "existence of an injury that a reasonable doctor or patient

would find important and worthy of comment or treatment"; (2) "the presence of a medical condition that significantly affects an individual's daily activities"; (3) "the existence of chronic and substantial pain"; and (4) "adverse medical effects or demonstrable physical injury." *See Chance*, 143 F.3d at 702; *Smith*, 316 F.3d at 187.

Where a claim concerns the temporary delay or interruption in the provision of medical treatment—as is the case here—then "the focus shifts to the particular risk of harm faced by a prisoner due to the challenged *deprivation of care*, rather than the prisoner's underlying medical condition in the abstract." *Edmonds v. Cent. N.Y. Psych. Ctr.*, No. 10 Civ. 5810 (DAB), 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011) (emphasis added); *see also Chance*, 143 F.3d at 702; *Smith*, 316 F.3d at 186–87; *accord Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188–89 (11th Cir. 1994) ("[D]elay in medical treatment must be interpreted in the context of . . . whether the delay worsened the medical condition."). A short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where "the alleged lapses in treatment are minor and inconsequential." *Smith*, 316 F.3d at 186. On the other hand, "the failure to provide treatment for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment." *Id.*; *see also Chance*, 143 F.3d at 702.

Here, Gantt alleges that the defendants acted with deliberate indifference by refusing to provide him with "proper" treatment of his rheumatoid arthritis and glaucoma. On the summary judgment record, Gantt received treatment for his arthritis and was given the opportunity to seek consultation as to his glaucoma as soon as he notified prison officials. Accordingly, his claim is properly characterized as challenging the adequacy and timeliness of treatment, not as asserting a failure to provide any treatment.

16

Measured against cases involving temporary delays or interruptions in the provision of treatment, these facts, taken in the light most favorable to Gantt, fall far short of satisfying the objective component of an Eighth Amendment claim.  In cases where temporary delays or interruptions in the provision of medical treatment have been held to satisfy the objective seriousness requirement, they have involved either a needlessly prolonged period of delay or a delay that caused extreme pain or exacerbated a serious illness.  *See, e.g.*, *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006) (assuming, *arguendo*, that a five-month delay in treatment for Hepatitis C caused sufficiently serious harm); *Chance*, 143 F.3d at 702 (finding a six-month delay in treatment for a dental condition that led to infection and extreme pain sufficiently serious); *Hathaway*, 37 F.3d at 65, 67 (finding a two-year delay in treatment of broken pin in an inmate's hip that caused persistent pain sufficiently serious).

Gantt's claim is based on the delay in his receipt of medication to treat his arthritis and glaucoma.  However, the summary judgment record reflects that he first informed defendants of his rheumatoid arthritis on October 15, 2008, a full month after his initial arrival at AMKC. *Compare* Sept. 17 Exam., *with* Oct. 15 Exam.  It further reflects that Gantt, on October 15, 2008, and five more times during the ensuing months, was given six prescriptions for medications intended to treat pain associated with his rheumatoid arthritis.  *See* MacDonald Decl. Ex. C (Oct. 15, 2008); *id.* Ex. E (Jan. 26, 2009); *id.* Ex. H (Feb. 26, 2009); *id.* Ex. I (May 7, 2009); *id.* Ex.J (June 27, 2009); *id.* Ex. M (July 12, 2009).  In addition, Gantt was seen by a rheumatology specialist at Bellevue Hospital.  *See* MacDonald Decl. ¶ 31.

As to Gantt's glaucoma, on the record before the Court, he did not disclose that condition to defendants until December 14, 2008, at which time the attending physician referred Gantt to the optometry clinic.  There is a dispute whether Gantt, as defendants claim, refused to attend his

scheduled appointment at the optometry clinic, or whether, as Gantt claims, he never refused treatment. Either way, however, there is no factual basis for a claim that Gantt at that time was denied treatment. Gantt was subsequently evaluated on June 27, 2009, at which time he disclosed that he had previously been prescribed Travatan and Timolol for his glaucoma. *See* June 27 Consultation Request. Gantt was again referred to the optometry clinic and, on the undisputed medical record, he failed to appear for his scheduled appointment. *See* Specialty Clinic Form. Finally, on July 14, 2009, Gantt was again referred to the optometry clinic, but he was discharged from DOC custody before he could attend his scheduled appointment. *See* July 14 Consultation Request; Dantowitz Decl. ¶ 3.

Even reading these facts in the light most favorable to Gantt, including treating the unsworn allegations in his Complaint as creditable allegations, Gantt has failed to demonstrate how the modest delays suggested above in the provision of medical treatment, or for that matter the actual medical treatment provided by the defendants, placed him at risk of serious harm. Gantt claims generally that he suffered pain caused by his arthritis, but Gantt does not allege that his pain or discomfort from either his arthritis or glaucoma was prolonged. Quite the contrary, in his deposition, Gantt stated that he was "in regular shape" and, in the Second Amended Complaint, acknowledged that his eyesight is as-yet undamaged by his glaucoma. Gantt Dep. 47; SAC 7. Thus, Gantt has not alleged that any delays in his treatment caused any symptoms of his underlying illnesses to worsen, or that any delays materially altered the way his diseases have since affected him. Furthermore, Gantt has not alleged, beyond making conclusory claims, that any delay in treatment, or any inadequacy of such treatment, has put him at an "unreasonable risk of future harm." *Smith*, 316 F.3d at 188. The facts at hand fall far short of those in cases in which courts have found an objectively serious injury.

Because Gantt has failed to satisfy the objective prong of the Eighth Amendment inquiry, the Court need not address the subjective prong.  However, the Court does so here in the interest of completeness.  Gantt's claim fails to meet the subjective standards because the facts failed to permit a factfinder to find that "the charged official[s acted] with a sufficiently culpable state of mind."  *Hathaway*, 99 F.3d at 553.

The deliberate indifference standard requires "more than mere negligence."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  It is "equivalent to criminal recklessness, [where] the official 'knows of and disregards an excessive risk to inmate health or safety.'"  *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) (quoting *Farmer*, 511 U.S. at 837).  "[A] prisoner must demonstrate more than 'an inadvertent failure to provide adequate medical care' by prison officials to successfully establish Eighth Amendment liability."  *Smith*, 316 F.3d at 184 (quoting *Estelle*, 429 U.S. at 105).

Here, Gantt does not allege, and if he had, the record would not support, that defendants acted with deliberate indifference to his medical needs.  On the contrary, Gantt's medical records demonstrate that the defendants were, at a minimum, fairly attendant to Gantt's medical issues.  They show that when Gantt requested treatment, prison medical staff responded. When Gantt informed medical staff of his rheumatoid arthritis and each subsequent time he complained of pain to medical staff, a prescription was issued for Naprosyn or another analgesic, and he was ultimately issued seven prescriptions for analgesics to address pain caused by his rheumatoid arthritis and seen by a rheumatoid specialist at Bellevue Hospital.  When Gantt finally disclosed his glaucoma, he was referred to the optometry specialty clinic for evaluation. The facts, without more, are inconsistent with the thesis that defendants acted with deliberate indifference to his medical needs.

As the Second Circuit has emphasized, the Eighth Amendment "is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." *Smith*, 316 F.3d at 184. "[N]ot every lapse in prison medical care will rise to the level of a constitutional violation." *Id.* Further, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. The facts before the Court permit a factfinder to find neither that Gantt suffered a sufficiently serious deprivation of medical care, nor that any lapse or delay was caused by a prison official's deliberate indifference. Accordingly, summary judgment must be granted for defendants on Gantt's Eighth Amendment medical care claims.

## CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment is granted and the plaintiff's Second Amended Complaint is dismissed in its entirety, with prejudice, as to all defendants. The Clerk of Court is directed to terminate the motion pending at docket number 81 and to close the case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: March 7, 2013
        New York, New York